LUTHER E. HALL, Judge pro tern.
On April 14, 1953 the City of New Orleans filed proceedings to expropriate a 72 foot strip running through squares 1911, 1984 and 2091 situated in the Third District of the city of New Orleans. Since there were conflicting claims to ownership of part of this strip the city impleaded the adverse claimants; among them being the appellants herein, Don L. Peterson and Raymond F. Twickler, and the appellees, New Orleans and Northeastern Railroad Company. The suit of the city resulted in a judgment in its favor expropriating the 72 foot strip at a price of twenty cents a square foot, and the total price amounting to $11,841.00 was deposited in the registry of court pursuant to the decree.
The effect of this was to refer to the proceeds deposited in the registry all adverse claims of ownership in and to the expropriated property.
Thereafter the trial court proceeded to hear and determine the relative rights of these claimants, more particularly the relative rights of the appellants and appellees.
The Louisville & Nashville Railroad Company claimed a servitude over a portion of the property to which was asserted by New Orleans and Northeastern Rail *176 road Company, and during the course of the trial the two railroads stipulated that in the event the New Orleans and Northeastern Railroad Company’s claim of title was upheld by the court, the fund representing the value of the land subject to the servitude would be divided equally between them.
Judgment was rendered on June 20, 1954 upholding the New Orleans and Northeastern’s claim of title and awarding to it the sum of $1,243.21 representing half the value of the strip subject to the easement of Louisville & Nashville Railroad, and $1,252.08 representing the remainder of the land to which title was asserted, making a total of $2,495.29. The judgment further awarded $1,243.20 to Louisville & Nashville Railroad being the remaining half of the fund allocated to the property covered by the easement.
Don L. Peterson and Raymond F. Twick-ler have appealed suspensively and devolu-tively from this judgment. Appellees by answer to the appeal, seek the affirmance of the judgment and also an award to them against appellants of legal interest on the amount of the judgment from date of deposit of the fund.
The land expropriated by the City of New Orleans in these proceedings consists of a 72 foot strip of ground lying east of and parallel to the nearby tracks of the New Orleans and Northeastern Railroad (which at this point run north and south) and extending across squares 1911, 1984 and 2091. Except for intervening streets these squares are adjacent to each other.
The only land involved in this controversy is the western 22 feet of the 72 foot expropriated strip, being that part thereof which is closest to the New Orleans and Northeastern tracks.
The basic issue in the case is the dispute between Peterson and Twickler, appellants, and New Orleans and Northeastern Railroad, appellee, over the ownership of this western 22 foot strip. The rival claimants claim the disputed property both by title and by the prescriptions of ten and thirty years.
The title under which appellees claim emanates from a conveyance by Edward L. Deluzain to New Orleans and Northeastern by Act dated March 5, 1905 before P. M. Milner, Notary Public, registered COB 199, Folio 305. Deluzain acquired title from John B. Patrick, by Act dated June 7, 1870 before P. C. Cuvellier, Notary. Appellants have not questioned the original validity of this Patrick-Deluzain title.
Appellants’ title originates in an adjudication to the State for non-payment of the taxes for the year 1882 assessed to Edward L. Deluzain by Act before Anthony Ker, Notary Public, on February 23, 1885, recorded COB 122, Folio 549, and a sale by the State to Joseph R. Bres by three State auditor’s deeds dated March 1, 1910, March 12, 1910, and March 22, 1910 respectively. Appellants acquired title by mesne conveyances from Joseph R. Bres. Appellees do not attack the tax sale to the State, its subsequent sale to Bres nor any link in appellants’ chain of title.
Appellants, Peterson and Twickler, claim a better record title supplemented by pleas of prescription of ten and thirty years acquiendi causa. Appellee, New Orleans and Northeastern Railroad, Company, claims title but relies principally on the prescriptions of ten and thirty years. The factual issue in the case is one of possession.
The record establishes indisputably that the main track or tracks of the New Orleans and Northeastern have extended across squares 1911, 1984 and 2091 since they were first laid. The original main line track (now the Southbound main line track) dates back substantially in its present location to the year 1883. The second main line track (Northbound) was constructed 14 feet to the east of and parallel to the initial track and the continuous use thereof began in 1908.
*177 The sale by Deluzain on March 8, 1905 conveyed to New Orleans and Northeastern a strip of ground running through these squares comprised between a west line drawn 35 feet from and parallel to the original main line track of New Orleans and Northeastern and an east line drawn 50 feet from and parallel to that track, the strip being sold out of the squares 1911, 1984 and 2091 purchased by Deluzain from John B. Patrick in 1870. It is thus seen that both main line tracks of New Orleans and Northeastern are located upon the strip of ground conveyed to-it by Deluzain. The land in controversy here is the eastern 22 feet of the strip thus acquired by New Orleans and Northeastern.
The basic contention of New Orleans and Northeastern is that it acquired the strip of ground in good faith by just title translative of property and that it has had not only constructive but actual possession thereof continuously since its acquisition in 1905 through the existence, maintenance and operational use of the tracks thereon and through the periodical clearing of its right of way which extended across the entire width of the area in dispute.
The appellants, Peterson and Twickler, contend that the New Orleans and Northeastern Railroad was not a purchaser in good faith, basing their contention on the fact that the tax researches annexed to its act of purchase in 1905 show a cancellation as per a judgment of the First City Court of the adjudication to the State and the taxes for which the land was adjudicated. This judgment of the First City Court was subsequently annulled by the Supreme Court (as to all persons except New Orleans and Northeastern Railroad Company which was not made a party defendant) in the matter of Ebert V. Woodville, 143 La. 874, 79 So. 521, decided in 1918. Appellants argue that the New Orleans and Northeastern Railroad must have had full knowledge of the facts at the time of their purchase, and if the company believed the judgment to be valid, its error was one of law which could avail appellee nothing.
The good faith of the appellee must be tested by what it knew or should have known on the date of the conveyance in 1905.
“It is sufficient if the possession has commenced in good faith; and if the possession should afterwards be held in bad faith, that shall not prevent the prescription.” LSA-C.C. art. 3482. See also Goree v. Sanders, 203 La. 859, 14 So.2d 744.
“Good faith is always presumed in matters of prescription; and he who alleges bad faith in the possessor, must prove it.” LSA-C.C. art. 3481.
The only fact which appellee is charged with knowing is that the tax adjudication was annulled by a judgment of the First City Court. We do not believe it was incumbent on it to examine into the validity of that judgment, and the validity thereof remained unquestioned until suit to annul it was filed seven years after appellee’s purchase and its invalidity was not declared by the Supreme Court until thirteen years later.
Appellants further contend that they and their authors in title have had constructive possession of the whole of squares 1911, 1984 and 2091 (including the disputed area) since 1885; had the squares surveyed by C. Uncus Lewis D. C. S. in 1912 and have had physical possession of the whole of the three squares for over thirty years through a tenant named Lionel Matthews and subsequently through his son, Ed Matthews.
As to the possession of the railroad, the record establishes that its mainline tracks have extended across the three squares since the beginnings of their existence, and are located upon that portion of the squares which it acquired from Deluzain in 1905. The record further shows that appellee has continuously maintained and operated the original track since 1883 and has continuously maintained and operated the second mainline track to the east of the initial track since its construction in 1908. Appel- *178 lee has also periodically cleared its right of way of tall grass, weeds, underbrush etc. for a distance of fifty feet east of the initial track. In other words, appellee as a part of its operations and maintenance has periodically cleared as a part of its right of way the entire twenty-two foot strip in controversy here. The record further shows that the embankment upon which the tracks are situated extends substantially into and upon the twenty-two foot strip, the toe of this embankment being located (at various points) from seven to fourteen feet within the strip.
Appellants, on the other hand, introduced testimony to show that their predecessors in title had the squares in question surveyed in 1912. They further showed that in the year 1917 they leased the three squares (plus two others) to one Lionel Matthews on condition that he fill the property with refuse from the city garbage carts and look after the property for their account, and that Lionel Matthews built a small house on the property and raised hogs nearby. Testimony taken on their behalf further showed that on the death of Lionel Matthews his son, Ed, took over the lease and has lived on the property ever since in a house which he testified he built fifteen feet from his father’s house.
There was some testimony on behalf of appellants that the house built and occupied by Lionel Matthews was located on square 1911 and that he raised hogs in pens close to his house and within sixty to seventy-five feet of the railroad tracks.
The actual location of this house seeming of prime importance to the trial judge, he reopened the case after its initial submission in order to have it located by survey. It developed that this house had burned about three years prior to the trial, but the ruins of Ed Matthews’ house (which also burned shortly before the trial) were identified and found to be 350 feet east of the railroad tracks and well to the east of any of the squares in question. In fact the ruins were located across Almonester Avenue in square 1910. According to the testimony of Ed Matthews, his father’s house was fifteen feet closer to the railroad than his was. He further testified that his father had three 15 feet by 20 feet hog pens, three or four feet apart commencing about 30 to 40 feet from his father’s house, and that no hogs were allowed outside of the pens. Clearly the Matthews’ houses and hog pens have no bearing on this litigation..
The survey also indicated that several other small shacks had been built in the three squares in question, but none of them near the 22 foot disputed strip. There is no showing that these shacks were built under any authority from appellants or their predecessors in title, although appellants have never disturbed the occupants.
As to the land fill, Mr. Ebert, one of appellants’ predecessors in title, testified that the filling took place continuously until he sold the property in 1947; that it was commenced on the side of the squares away from the railroad and was gradually extended toward the tracks but was kept away from the right of way of the railroad as a result of the railroad’s protest.
In summary the record shows that whatever possession appellants might have of those portions of the squares not in contest they have had no actual possession of any part of the 22 foot strip. The mere fact that Lewis, the surveyor, entered upon the strip in 1912 for the purpose of establishing the corners of the squares was not in our opinion a disturbance of the possession of the railroad. See Jones v. Goss, 115 La. 926, 40 So. 357; Albert Hanson Lumber Co., Limited v. Baldwin Lbr. Co., Limited, 126 La. 347, 52 So. 537.
On the other hand, the railroad has had actual possession of the strip. In John T. Moore Planting Co., Limited v. Morgan’s Louisiana & T.R. & S.S. Co., 126 La. 840, 53 So. 22, wherein the railroad had no title, *179 it was awarded a servitude on the grounds of occupancy and user, the court said:
“The parts covered by this servitude are the roadbed and embankment, down to the toe of the embankment; the drainage ditches on each side of the roadbed; including both slopes of the said ditches; * * (126 La. at p. 880; 53 So. at page 36.)
In that case it is noted that the railroad, as here, had a servitude upon and operated over the land for many years and thereafter acquired a deed to the property. The court held that the wording of the deed was ineffective as a conveyance of the fee and added by way of dicta that even if the deed had conveyed the fee and the railroad intended to take possession as owner under the deed there still would not have been such a possession as would serve as a basis for prescription of the fee, the court stating:
“The precarious possessor who acquires a title from a third person, and desires no longer to hold precariously but animo domini, cannot content himself with simply continuing the old possession, without outward change, and rely simply upon the bare fact of his new title and of its registry to inaugurate a new possession. He must give some outward sign, of a nature to let the owner know of the intention to put an end to the old order and inaugurate the new.” (53 So. at p. 34)
This holding would seem to be predicated upon the ignorance of the naked owner of the change in intention of the precarious possessor.
In the instant case appellants and their predecessors in title have been aware of appellee’s deed for over thirty years and of appellee’s possession thereunder. During the course of the Ebert-Woodville litigation plaintiff, Ebert, one of appellants’ authors in title, was informed (if he did not already know it) that the New Orleans and Northeastern claimed ownership, to a part of the area covered by his tax title. This appears from the following language in the opinion of the Supreme Court in that case which was decided in the year 1918:
“ * * * As the New Orleans & Northeastern Railroad Company, said to be the owners of parts of the property involved, is not a party defendant, the decision of the case does not affect its title.” (143 La. at p. 878, 79 So. at p. 522)
Parenthetically it would seem that the logical next step would have been a suit by Ebert against the railroad for tax-title confirmation. However he and his successors in title never made any move in that direction either in 1918 or subsequently, and the tax-title was judicially asserted against New Orleans and Northeastern for the first time in this 1953 expropriation suit.
Appellants argue that they have constructive possession of the totality of the squares involved, that the railroad has constructive possession of the 22 foot strip, and that this case involves the age-old controversy of overlapping and conflicting constructive possessions between adjoining land owners, and that the owner with the valid title must prevail.
We are of the opinion however that the conflict here is not between conflicting constructive possessions of the 22 foot strip, but between the constructive possession of appellants and the actual possession of appellee.
In Carey v. Cagney, 109 La. 77, 33 So. 89, 91, the Supreme Court said :
“While constructive possession springing from a later title deed ousts constructive possession which had been held under an earlier title deed, constructive possession can in no case have the effect of ousting actual possession held under an adverse title giving color of right. One is a fiction of law; the other a tangible fact. The fiction is inoperative as against the fact; the unreal as against the real. The actual *180 possession here referred to means corporeal detention of the property.”
In conclusion we hold that New Orleans and Northeastern Railroad Company acquired the property in good faith under a just title translative of property and has had actual corporeal possession of the entirety of the strip for over thirty years regardless of whether it might be argued that prescription did not begin to run until the 1918 decision of Ebert v. Woodville supra. We further hold that the actual possession of the railroad prevails over the constructive possession of the appellants.
Appellee’s prayer that appellants be required to pay interest on the amount of the judgment in its favor from the date of the deposit of the fund in the registry of the court must be denied. We know of no authority for such an allowance. The funds in the registry earn no interest, and no personal judgment has been rendered against appellants to which interest could attach.
For the foregoing, reasons the judgment appealed from is affirmed.
Affirmed.